# EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

TORAY PLASTICS (AMERICA), INC.

VS. C.A. NO.:06-219ML

T.G. PLASTICS TRADING CO., INC. d/b/a NATIONAL PLASTICS TRADING CO., and PLANET EARTH RECYCLING INC.

DEPOSITION OF GEORGE WATTS, witness in the above-entitled cause, taken on behalf of the Plaintiff, pursuant to notice, before Sally Brassard, CSR, a Notary Public in and for the State of Rhode Island and Providence Plantations, at the office of Nixon Peabody, LLP, One Citizens Plaza, Suite 500, Providence, Rhode Island, on January 31, 2007, at 9:00 a.m.

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

Page 10

A. Yes, sir.
Q. Where have you worked since then?
A. I went from Toray to Slater companies up in Pawtucket. I worked there for a year. Then I worked at a consulting company, Planning for Demand, out of Pittsburgh. I worked there until October of last year and I am waiting for another job now.
Q. You're in between?
A. Right.
Q. How long did you work at Toray?
A. About fifteen years.
Q. And what was your position at Toray in the fifteen years?
A. I had a number of different positions.
Q. What were they?
A. I started as material specialist in 1990. In around 1996, I was a project manager for an ERP implementation, and then from 2000 to 2005, I was materials and logistics manager.
Q. What were the dates for materials manager?
A. 19 -- 2000 to 2005, roughly. I could be off by a year.
Q. What were your duties and responsibilities as a materials specialist from 1990 to 1996?

Page 11

A. I was responsible for materials planning, for the Lumirror division.
Q. And what is the Lumirror division?
A. They make polyester film.
Q. What were your duties and responsibilities as project manager from approximately 1996 to 2000?
A. We were implementing a new ERP system. I was responsible for the implementation team in getting the system implemented at the different plants.
Q. Different plants, meaning where?
A. The three plants in Rhode Island, North Kingstown and the plant in Virginia.
Q. And what were your duties and responsibilities as materials manager from 2000 to 2005?
A. Basically materials planning, packaging, shipping, receiving, warehousing for the Lumirror and Torayfan divisions.
Q. What sort of materials?
A. Raw materials, work in process.
Q. What do you mean by raw materials?
A. The raw materials used in the manufacture.
Q. And those would come from off site?
A. Right.
Q. And what do you mean by, work in process?
A. Manufactured goods in process that haven't

Page 12

gotten to finished goods yet.
Q. Now, I believe we agree that you left Toray in March of 2005; correct?
A. Yes.
Q. Since you left Toray, up until today, I think we also agree that you spoke with me to schedule this deposition; correct?
A. Yes.
Q. Have you spoken with anyone at Toray regarding its dispute with National Plastics and Planet Earth?
A. No.
Q. Have you spoken with anyone at National Plastics or Planet Earth regarding this dispute with Toray?
A. Yes.
Q. Who have you spoken to?
A. I've spoken to Torge a few times.
Q. All right. How many times have you spoken with Torge since March of 2005?
A. I'm not sure.
Q. More than once?
A. More than once, maybe six.
Q. Approximately when did these conversations occur?
A. Well, I had some conversations with him right after I left, which would have been in the March/April time frame.

Page 13

Q. March and April of 2005?
A. 2005.
Q. Approximately how many conversations in that two-month time frame?
A. Maybe three.
Q. And when were the other conversations?
A. Well, he had, you know, called me around the middle of last year. You know, I know there were issues going on between National and Toray Plastics. So, he was just, you know, kind of keeping me updated on what was going on, you know, after I had left. And later on in the year, I knew that there was, you know, competing lawsuits going on. So --
Q. All right. Let me try to set a reference point for you. Toray filed this lawsuit in May of 2006, okay. You can just accept that I'm telling you the truth on that one. We know that you had three conversations with Torge in or around March/April 2005; right?
A. Right.
Q. Using the time we filed the lawsuit as a reference, did you have further conversations with Torge before the lawsuit was filed?
A. Not that I recall.





62c7cabe-89ae-40d0-bbeb-0f7f07b67f65

Page 14

Q. Okay. So, the conversations with Torge in 2006 were after the lawsuit was filed, assuming that the lawsuit was filed in May of 2006; correct?
A. I did have conversations with him prior to that date and I had some conversations with him after that date.
Q. Okay. But we've established that there's about three conversations in the March/April '05 time frame; correct?
A. Correct.
Q. Did you have any other conversations in 2005 with Torge?
A. After that time?
Q. Correct. In 2005, after the initial three or so conversations.
A. Yes.
Q. Okay. Approximately when, and how many conversations?
A. I can't recall how many. You know, maybe three or four.
Q. Okay. And approximately when did these three or four conversations take place?
A. Probably later in the summer into the fall.
Q. Of 2005?
A. Right.

Page 15

Q. Approximately how many conversations did you have with Torge in 2006?
A. Well, I didn't keep track, but maybe six.
Q. All right. I understand we're talking, approximate. It could be five, it could be seven, but it's approximately six; right? Is that fair to say?
A. Yes.
Q. And approximately when did you have these conversations with Torge in 2006?
A. I can't recall exactly when. I mean, over the course of the year.
Q. Were they spread over the year 2006 or were they clustered in one specific time frame?
A. They were pretty much spread out as far as I can recall.
Q. All right. So, have you spoken with Torge in 2007?
A. I think I might have talked to him once.
Q. According to Exhibit 1, you were served with the deposition notice on November 20th of 2006; correct?
A. Right.
Q. And we know that you spoke with Torge once in January 2007. So, that's obviously after you were

Page 16

served with the deposition subpoena. Were any of the conversations in 2006 after you were served with the deposition subpoena?
A. What was the date of that?
Q. November 20th, 2006.
A. Yes, I think one.
Q. So, since you left Toray in March 2005, it appears that there's approximately, you know, twelve to fourteen conversations you've had with Torge; correct?
A. Yes.
Q. In your mind, can you separate the conversations or do they all appear to be one or just in groups?
A. I'm not sure I understand.
Q. You've had approximately a dozen to fourteen conversations over a year and a half-time frame and I want to ask you some questions about what was discussed in those conversations. So, my initial question is, in your mind, can you separate what was said in one conversation versus another, or is it just a series of conversations?
A. I think in the earlier discussions I had with him, you know, they were pretty much related to the fact that I had left Toray. So, those discussions were probably different than some of

Page 17

the discussions later on.
Q. All right. In the earlier discussions which you said, I think, were the three in March/April of 2005; is that fair to state?
A. Uh-hum.
Q. You have to say, yes or no.
A. Yes.
Q. Who called whom initially in March/April 2005?
A. I know I called him the first time, which was just after I left, just to let him know that I wasn't at Toray anymore. And, after that, I don't remember who called who.
Q. All right. During those initial three conversations in March/April 2005, what was discussed?
A. As far as I can remember, just, you know, the fact that I had left Toray. And he asked, you know, like, who was going to be handling the business? I said, I'm not sure. Just kind of general issues.
Q. Issues of transition or responsibility, is that fair to state?
A. Yes, and also just personal issues, you know, because I'd had a relationship, you know, business relationship with him for fifteen years.





62c7cabe-89ae-40d0-bbeb-0f7f07b67f65

Page 18

Q. What kind of personal issues did you discuss?
A. Well, just, you know, if he was going to be in town to meet up. You know, sports, whatever.
Q. What do you mean, sports?
A. Just what was going on with the teams.
Q. Okay. All right. So, were these conversations in March/April of 2005 over the phone or were they in person?
A. Phone.
Q. And do you e-mail Torge from your home e-mail?
A. No.
Q. So, any e-mails that you would have had with Torge or people at National Plastics and Planet Earth would have been on your Toray e-mail?
A. Yes.
Q. No other e-mails?
A. No.
Q. Correct?
A. Yes.
Q. Let's focus now on the three or four conversations you had with Torge in the summer/fall of 2005. Were they in person or on the phone?
A. He was here once during that time period. I met with him, you know, for dinner.
Q. Do you remember what month that was?

Page 19

A. No.
Q. Why did you have -- who else was at the dinner?
A. Just me and Torge.
Q. Okay. What did you discuss at the dinner?
A. I know he talked about the issues going on with Toray.
Q. Was this -- so this is before the lawsuit was filed then, if it was in 2005?
A. Yes.
Q. So, what issues did Torge tell you were going on in the summer/fall of 2005 when you had dinner?
A. I don't remember exactly what he said. I mean, I knew he was having problems with Toray in terms of the business relationship and how things were going, but I don't remember exactly what he said.
Q. Again, just to set the time frame, this is in the summer/fall of 2005?
A. Right.
Q. And you don't recall the specifics, what was said?
A. No.
Q. Did you tell him anything concerning this issue?
A. No. I mean, I was gone.
Q. Did you tell him, I can't talk to you about my former employer because, you know, I'm a former

Page 20

employee. I have a separation agreement. I can't talk to you. Did you tell him something like that?
A. No.
Q. Did you continue to talk to him about Toray after he was asking you about it?
A. Well, he wasn't asking me. I mean, he was telling me what he was going through. He wasn't -- as I recall, he wasn't asking me specific questions about --
Q. You don't remember anything specific that he told you during this dinner conversation?
A. No.
Q. Where did you guys go for dinner anyway?
A. I think it was at the, you know, the airport hotel down by -- in Warwick.
Q. Like the Crowne Plaza?
A. Crowne Plaza.
Q. So, there was another two or three conversations that you had with Torge in the summer/fall of 2005 in addition to this dinner; correct?
A. Uh-hum, yes.
Q. And were these in person or on the phone?
A. Phone.
Q. And what was discussed?

Page 21

A. I don't really remember. I mean, it had to do with, again, you know, a combination of just personal updates of what I was doing with work and, you know, what -- how his business was going.
Q. Was there any discussion about National Plastics or Planet Earth's dispute with Toray?
A. Well, I don't recall exactly except I do, you know, recall that he would update me on what was going on with Toray.
Q. This is all in 2005 still; right?
A. Yes.
Q. And do you recall what he was updating you about with Toray?
A. Well, he told me that he was having problems with the business, you know, with a 100 percent supply arrangement.
Q. What 100 percent supply arrangement? I should say, what do you mean by that clause, that statement?
A. Well, we had, you know, between Toray and National, had a 100 percent supply agreement for scrap and offspec materials that were set up to run through 2005. What he told me was that Toray was trying to back off of that deal.
Q. All right. Let me break that down a little bit.





62c7cabe-89ae-40d0-bbeb-0f7f07b67f65

Page 22

The term, a 100 percent supply arrangement, was that a term that he used or is that a term that you're using?
A. That was a term that -- it's a term that I'm using and he used.
Q. So, you both used that term?
A. Yes.
Q. You used the term scrap and offspec material, what do you mean by that?
A. Those are the categories of material that were included in that arrangement.
Q. From which divisions?
A. The Lumirror, Torayfan and OBR.
Q. Now, is this agreement in writing?
A. It was in writing.
Q. And what was the term of the agreement?
A. The time period?
Q. Yes.
A. It was from November of '04 through December of '05.
Q. And you recall this being in writing, you said?
A. It was in an e-mail.
Q. And what would happen if scrap offspec material was offered to National Plastics or Planet Earth and they didn't want it?

Page 23

A. Well, when I was there, that situation didn't come up. You're saying, what if that happened?
Q. Yeah. Does the agreement speak to what would happen if National Plastics or Planet Earth didn't want scrap offspec material presented to it by Toray?
A. It didn't specifically lay that out.
Q. So, as far as you know, through March of 2005, all scrap and excess material -- sorry, all scrap and offspec material was offered to Toray; is that right?
A. After March of 2005?
Q. Up until March 2005 when you were there.
A. Yes.
MR. ANESTA: You said, was offered to Toray.
MR. BRENNER: Sorry, I meant to say, Torge. Let me start again.
Q. Up until the time of March 2005 when you left Toray, is it your testimony that Toray offered all scrap and offspec material to Torge? And by Torge, I mean, National Plastics or Planet Earth.
A. Yes.
Q. And we know from your testimony that you haven't spoken to anyone at Toray regarding the parties in

Page 24

this case since you left in March of 2005; correct?
A. Yes.
Q. So, anything that you know or that you believe happened since you left Toray would have been information you received from Torge; right?
A. Yes.
Q. And you haven't done anything to confirm with Toray if what Torge is telling you is accurate in Toray's mind; right?
A. Yes.
Q. Let's return to the conversation -- we're still in 2005. We've been through the dinner and summer/fall of 2005, and you've had two or three other conversations with Torge in that time period, fall/summer of 2005; correct?
A. Yes.
Q. Is there anything else that you discussed with Torge in those conversations concerning Toray?
A. Not that I recall.
Q. Okay. Do you recall any more specifics of what Torge told you concerning Toray not offering all scrap and offspec material to him in 2005?
A. No.
Q. Do you recall any other complaints that Torge

Page 25

might have told you in 2005?
A. No.
Q. Let's focus in 2006. We know there's about a half dozen conversations throughout that year; right? Correct?
A. Yes.
Q. Were these conversations in person or on the phone?
A. On the phone.
Q. Had you met with Torge at all in 2006?
A. I did meet with him once in 2006. I think October, I'm not positive.
Q. So, in or about October 2006, you met with Torge; right?
A. Yes.
Q. Was that meeting here in Rhode Island?
A. Yes.
Q. Where was it?
A. We had dinner at the Biltmore.
Q. Was it McCormick & Schmitz, is that the restaurant there?
A. I think so.
Q. Who else was at -- was anyone else at the dinner or was it just you and Torge?
A. Just me and Torge.

Page 26

Q. And what did you discuss?
A. Relative to Toray, he, again, just updated me on what his, you know, how business was going with Toray and how he thought it was heading south. And, other than that, you know, it was mostly personal discussions.
Q. Well, let me just, again, remind you of the timing that Toray filed suit in May of 2006. So, if the dinner was in October of 2006, that was a few months after the lawsuit was filed and there was no ongoing business between Toray and National Plastics or Planet Earth. Do you agree with that?
A. I don't know that but I'll agree.
Q. So, during the conversation that you had with Torge in the meeting that you believe took place in October 2006, was it your understanding that there was still ongoing business between National Plastics and Planet Earth and Toray?
A. I wasn't sure.
Q. Do you remember any other specifics that were discussed during that meeting with Torge regarding Toray?
A. No.
Q. Do you recall what else he told you?
A. Other than what I've said, I mean, generally,

Page 27

he said the business was going down. I mean, whether it was gone or --
Q. Let me focus you on the other conversations you had with Torge in 2006. What did you discuss, generally, in these conversations?
A. Generally, you know, he would ask me, you know, what was our, you know, relationship when I was there. You know, what was the understanding -- did I have the same understanding he had about what kind of arrangement or deals that we had, you know, kind of historically with Toray.
Q. Do you remember any of the specifics of the conversation, as far as what his questions were, what your responses were?
A. Well, I think it was related to the arrangement that we had with, you know, between Toray and National for that 2005 agreement that was -- you know, negotiations started in -- around September of '04, and then were concluded in October of '04 for November to December of 2005. We discussed the -- what steps went through that process between Toray and National.
Q. Did you discuss the terms of what the business relationship was, at least as far as you recalled?
A. Only to the extent that we both knew what they

Page 28

were when I was at Toray.
Q. Okay. And what's your recollection of what the business terms were between Toray and National Plastics and Planet Earth?
A. For that period was that they would get 100 percent of the business for that material from November of '04 through December of '05.
Q. And there was no agreement as far as what would happen after December of '05; correct?
A. Yes.
Q. And the agreement didn't contemplate what would happen if National Plastics or Planet Earth didn't want material offered to it by Toray; correct?
A. Yes.
Q. Why was Toray using National Plastics and Planet Earth as vendors to this material scrap as opposed to just using National Plastics?
A. My recollection of that was that for credit insurance purposes, our finance department wanted to have those companies split up to -- because there was a maximum for each of those businesses from a credit insurance purpose.
Q. So, as far as you recall, as you sit here today, there was a business -- is it fair to state that there was a business relationship between National

Page 29

Plastics and Toray as well as between Planet Earth and Toray?
A. Yes.
Q. And invoices were sent from Toray to National Plastics, and from Toray to Planet Earth, for the various materials that were sold; correct?
A. I'm not positive about, you know, how the invoices were sent out and the actual billing was done.
Q. If you don't know, that's fine.
A. I don't know.
Q. If National Plastics or Planet Earth had an issue where they felt they were owed a credit, did you get involved in that?
A. Yes.
Q. And how would you become involved with that issue?
A. I would get a credit request from one of the National staff.
Q. Someone from Torge's staff?
A. Right.
Q. And would you look into it?
A. Yes.
Q. And what would you do to look into it?
A. Typically would look into the -- if it was a weight claim, you know, might try to get a weight

ticket from a container, or depends on the type of claim.
Q. And in what situations would you approve or recommend that a credit be given to National Plastics or Planet Earth?
A. If there was any backup documentation, it would show that the credit should be authorized, you know, either a weight ticket or somebody from the shipping department would concur that there was a problem and credit would generally be issued.
Q. So, is it fair to state that while you were at Toray, and involved with analyzing claims for credit by National Plastics or Planet Earth, that you and Toray required documentation of any weight issues or any other issues where they wanted a credit?
A. There were some situations where, you know, if there were types of scrap that didn't go in containers and there weren't, you know, weight tickets available for -- then a judgment would have to be made sometimes on a claim and sometimes materials, for instance, would be stored outside and there would be -- maybe water would accumulate in some of the materials so that the weights would



be, you know, overstated. Some judgment would have to be used on some of that.
Q. And if you were involved in receiving a complaint by someone at National Plastics or Planet Earth and the documentation was presented, or a visual inspection was evidenced, would the credit be given?
A. Yes.
Q. If there was no documentation or any other visual cooperation of the claim, would the credit be given?
A. At times it would and others it wouldn't.
Q. Let me return to the conversations that you had in 2006. Have you told us everything that you can recall regarding the dinner you had with Torge?
A. Yes.
Q. What else was discussed, or any other conversations with Torge in 2006?
A. Again, it was just what he was telling me about the problems he was having with Toray.
Q. Do you remember anything else specific that he told you?
A. Well, he said that -- you know, Toray, you know, had not given him the material.
Q. Any material, or some of the material?



A. Any, or some of the material, I don't recall.
Q. And how would you respond to Torge's statements to you?
A. Well, you know, my understanding when I left was that he had, you know, 100 percent supply agreement. So, I didn't -- that was my understanding. I wasn't sure what had happened in the meantime.
Q. So, just so I'm clear, you would say to Torge, I don't know what you're talking about. When I was there, you got all the material. I'm just trying to figure out what you would say in response to those complaints by Torge. Can you be more specific?
A. Well, I don't know what happened after I left. So, I just -- I mean, as far as I knew when I left, he had, you know, an agreement for that material. He told me that, you know, that, you know, that from -- he told me that he thought that Toray was trying to get out of that deal and I don't know what happened.
Q. That the OBR, being 100 percent exclusive arrangement?
A. Yes.
Q. Now, you had one conversation with Torge in



January of '07; correct?
A. Yes.
Q. What did you discuss in that conversation?
A. Well, at that point, you know, he -- we knew this deposition was coming up and the discussion was just, you know -- what was going to happen at the deposition.
Q. Well, did he call you or did you call him, or did you meet?
A. No, we didn't meet. I don't remember if I called him or he called me.
Q. Well, what did you tell him during this conversation?
A. Well, I told him that, you know, I had been deposed. You know, I told him it had been rescheduled a few times. You know, I told him I'd come in here and just tell them whatever they want to know.
Q. Did he ask you to say anything at the deposition?
A. No.
Q. Did you tell him what you were going to testify to at the deposition?
A. No. Well, only to the extent that as far as that, you know, agreement with the supply, I mean I assume that's what was going to be, you know,

Page 34

most of the questions were going to be about.
Q. Why did you assume that?
A. I assumed that because of the, you know, that business headed south and, you know, my thinking was it had to be related to that deal.
Q. So, any assumptions that you made about what this deposition would cover would stem from your previous conversations with Torge; right?
A. Yes.
Q. Has Torge told you what his claims are in this case?
A. No.
Q. Has he told you what he believes Toray's claims are in this case?
A. I don't know, specifically. Again, I'd have to make an assumption but he didn't tell me, specifically.
Q. What's your assumption?
A. That Toray's claim is nonpayment.
Q. Why would you assume that?
A. Because if National had paid for everything, then what would the claim be?
Q. Okay. Have we exhausted your recollection as to any conversations that you had with Torge since you left National -- since you left Toray?

Page 35

A. Yes.
Q. Have you spoken with anyone else from National Plastics or Planet Earth concerning Toray or the dispute between them and Toray?
A. No.
Q. Have you spoken with Torge's attorney, Mr. Glantz, or someone else from his office, since you left Toray?
A. They called me once just around a month ago.
Q. Who's they?
THE WITNESS: What's your name?
MR. GLANTZ: Perry.
MR. BRENNER: The other attorney in the room is Perry Glantz.
THE WITNESS: Yeah.
MR. BRENNER: He's the other attorney for the defendants in this case.
Q. Have you ever met him before today?
A. No.
Q. Have you spoken to him before today?
A. Yes.
Q. When did this conversation take place?
A. About a month ago.
Q. So, this is in December?
A. Yes, I believe so.

Page 36

Q. All right. Had you spoken to him before December of 2006?
A. No.
Q. Had you spoken to anyone from his office, other than that one conversation with him in December 2006?
A. No.
Q. You used the term, they. Was it Torge and Mr. Glantz that you spoke with or were there other people?
A. Just Mr. Glantz.
Q. Oh, just Mr. Glantz. Okay. And what did you discuss with him?
A. He called me. He wanted to, you know, confirm what Torge had told him about the relationship between -- you know, between Toray and National Plastics relative to that agreement for the scrap and offspec.
Q. What did he tell you his understanding was of the relationship between Toray and National Plastics and Planet Earth?
A. His understanding was that National had an agreement with Toray Plastics for 100 percent of the scrap and offspec material for 2005.
Q. Is that all he said?

Page 37

A. I mean, that was the gist of the conversation.
Q. And what did you say in response?
A. I said that was my understanding.
Q. Do you recall anything else you spoke to Mr. Glantz about during this conversation?
A. No.
Q. Did he call you or did you call him?
A. He called me.
Q. Were you surprised that he called you?
A. No.
Q. Did Torge, or someone else, tell you he was going to be calling?
A. Yes.
Q. All right. Well, we haven't -- I didn't get that from your recollection of your conversations with Torge. When did Torge tell you this?
A. Well, it would be a few weeks before that.
Q. So, in a conversation you had with Torge in December 2006, he told you to expect a call from his attorney?
A. Yes.
Q. Did he tell you what you would be discussing with his attorney?
A. No.
Q. Did you say to either Torge, or to Mr. Glantz,





62c7cabe-89ae-40d0-bbeb-0f7f07b67f65

that you have a separation agreement when you left Toray, and that you're not supposed to talk about, you know, Toray business issues? Did you tell him that?
A. No.
Q. Do you recall that you have a separation agreement?
A. I recall I have a separation agreement, yes.
Q. Do you recall the terms of it?
A. Not specifically.
Q. Have you spoken with Wayne Warner or anyone from Jessica Transport Services since you left Toray?
A. No.
Q. Have you spoken with anyone else since you left Toray regarding Toray's business relationship with National Plastics and Planet Earth?
A. No.
Q. Sir, I'm showing you what's been marked as Exhibit 3.
(Plaintiff's Exhibit 3 marked for ID.)
Q. I'll ask you to read that to yourself, and let me know when you're done. Are you done reading the statement to yourself?
A. Yes.
Q. Do you recognize Torge's signature at the bottom



of page 3?
A. Yes.
Q. It appears to be dated, April 25th, 2005; correct?
A. Yes.
Q. And do you recognize the signature beneath Torge's signature?
A. Yes.
Q. And is that someone at Human Resources at Toray?
A. Yes.
Q. Now, I want to focus you on some of the statements made on this exhibit. On the third bullet point down, beginning on: Several occasions, and then it lists five subpoints. Is that an accurate statement?
A. Except for Omaha Steaks.
Q. So, who provided you with four tickets to a concert in Buffalo, including airfare, for the concert?
A. Torge.
Q. Do you know if it was him, personally, or through his company?
A. I'm not sure.
Q. It just happened?
A. Yeah.
Q. How did it happen? Did you ask him for this? Did



he offer it?
A. He regularly said that, you know, if there were any concerts that I was interested in, you know, he had a contact and could get tickets.
Q. Okay. So, with respect to this concert in Buffalo, who was the concert for? Who was the performer, I should say?
A. I think it was Elton John.
Q. Did you ask him for Elton John tickets in Buffalo or did he say to you, hey, I have tickets, or I can get tickets for Elton John in Buffalo, would you like them?
A. I believe I asked for them.
Q. Why did you do that?
A. We had done it a few times previously.
Q. Who's the, we?
A. Well, I had done it with Torge.
Q. What other concerts did -- you got other concert tickets?
A. We had gone to an Elton John concert earlier in Foxboro.
Q. So, did you also obtain from Torge, tickets to a Phil Collins concert at the Fleet Center in Boston?
A. Yes.



Q. Did you ask him for the tickets or did he offer them to you?
A. I don't recall specifically about that.
Q. Did he go with you to Phil Collins at the Fleet Center?
A. No.
Q. Did he go with you to the concert in Buffalo?
A. No.
Q. How many tickets did you get for the Phil Collins concert?
A. Four.
Q. And the four people who went to Elton John in Buffalo and Phil Collins in Boston, were these just friends and family of yours?
A. Yes.
Q. And you went, as well?
A. Yes.
Q. All right. Third one, evenings out at the Foxy Lady where Torge paid for the entire evening to include drinks and a private room. How many times -- did you go to the Foxy Lady with Torge?
A. Yes.
Q. How many times did that happen?
A. Three or four.
Q. Are these all before -- strike that. Were these





62c7cabe-89ae-40d0-bbeb-0f7f07b67f65